# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

IN RE:

DWAYNE E. MCCLELLAND,

      Debtor.

_____

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

DWAYNE E. MCCLELLAND,

      Defendant.

No. C22-4062-LTS

**MEMORANDUM OPINION
AND ORDER ON
BANKRUPTCY APPEAL**

## I. INTRODUCTION

This case is before me on an appeal (Docs. 1, 10) by the United States of America (the Government) from an October 21, 2022, decision of the United States Bankruptcy Court for the Northern District of Iowa (the Bankruptcy Court).[1] The Government argues that the Bankruptcy Court erred by discharging a portion of debtor Dwayne McClelland's debt to the Social Security Administration (SSA). McClelland filed a resistance (Doc. 12) and the Government replied (Doc. 13). Oral argument is unnecessary. *See* Local Rule 7(c).

---

[1] The Bankruptcy Court's ruling is on this court's docket at Doc. 1, pp. 3-14.

## II.    SUMMARY OF RELEVANT FACTS

### A.    SSA Work Programs

Individuals who are disabled may qualify for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  By definition, those who are disabled are unable to perform substantial gainful activity (SGA).  20 C.F.R. § 404.1505.  SGA constitutes work that (a) involves doing significant and productive physical or mental duties and (b) is done (or intended) for pay or profit.  20 C.F.R. § 404.1510.  Individuals who earn some amount of income remain eligible for DIB until their monthly earnings cross an income threshold set by the SSA.  20 C.F.R. § 404.1574, *et seq.*, § 416.974; *see also* Social Security Administration, Social Security Handbook, § 620.5.  Individuals must report their income to the SSA while receiving DIB and the SSA informs potential recipients of this requirement when they apply for benefits.  Doc. 11 at 178-201.

The SSA has established various work programs to encourage DIB recipients to seek employment if they are able.  Two programs are relevant to this case: (1) the trial work period (TWP) and (2) the extended period of eligibility (EPE).  During the nine-month TWP, DIB recipients are allowed to test their ability to work without immediately forfeiting their DIB.  20 C.F.R. § 404.1592.  Therefore, even if a DIB recipient's income exceeds the SGA threshold during the TWP, the recipient is still entitled to benefits.  *Id.*  The nine months of a TWP do not have to be consecutive but must take place within a five-year period.  Doc. 11 at 215.

The EPE is closely related to the TWP.  Once a recipient's TWP ends, the 36-month EPE begins.  20 C.F.R. § 1592a.  The first time an individual's income exceeds the SGA threshold during the EPE, the individual will still receive DIB for that month and the following two months (regardless of their income during those two months), so long as that person's overall status has not otherwise changed.  20 C.F.R. § 1592a(a)(2)(i).  If the individual's income exceeds the SGA again within the EPE, the

2

individual is not entitled to DIB for that month but is not irrevocably terminated from DIB eligibility. Instead, he or she remains entitled to DIB benefits in subsequent months during which that person's income does not exceed the SGA. *Id.* However, after the 36-month EPE ends, an individual becomes ineligible for any DIB (for that month and moving forward) if he or she earns income above the SGA threshold. 20 C.F.R. § 1592a(a)(3)(i).

Because DIB recipients' eligibility may change from month to month, they occasionally receive payments to which they are not entitled (overpayments). When this occurs, the SSA assesses the overpayments and then notifies the beneficiaries what they are obligated to repay. If beneficiaries believe the SSA erred in its assessment, the beneficiary may file an administrative appeal within 60 days. 20 C.F.R. §§ 404.521, 404.909(a)(1). Even if the SSA is correct in its assessments of overpayments, beneficiaries may seek a waiver to avoid repaying the fees if they are "without fault" or "if adjustment or recovery would either defeat the purpose of title II of the Act, or be against equity and good conscience." 20 C.F.R. § 404.506. If a beneficiary does not appeal the overpayment assessment or seek a waiver, the overpayment assessment becomes binding. 20 C.F.R. §§ 404.905, 404.902.

### B.    *Factual Background*

McClelland applied for DIB in March 2010 and submitted a separate application on behalf of his minor child in May 2010. Doc. 11 at 42, 44. In August 2010, the SSA granted McClelland benefits, which he received until November 2016. *Id.* at 44, 46. McClelland admits he knew that as a condition of his benefits, he was obligated to report his earnings from any employment he undertook. *Id.* at 45. The basis of this bankruptcy dispute arises from various overpayments he received during that time period.

From August 2010 to December 2012, McClelland did not report any earnings to the SSA but admits he was employed at various companies. On December 14, 2012, after various earnings appeared on his Social Security records, the SSA requested that

McClelland complete a Work Activity Report and list any employment he had undertaken since February 2010. Doc. 11 at 202. In its letter to McClelland, the SSA noted its records reflected that McClelland had worked for the following employers: Akima Construction Services (Akima), Tradesmen International (Tradesmen), Eagle Systems, Inc. (Eagle Systems), McCarty Corporation (McCarty), Loadcraft Industries, Ltd. (Loadcraft) and A-One Plus Home Health Care (A-One). Doc. 11 at 202. McClelland completed the requested report on December 28, 2012. *Id.* at 45. He reported earnings from the same employers the SSA listed in its letter but did not report any income from Tradesmen. *Id.* at 204-212.

On October 17, 2013, the SSA notified McClelland that it had reviewed his earnings from February 2010 through October 2013. *Id.* at 213. The SSA found McClelland's work from October 2011 onward did not constitute SGA and he would temporarily continue to receive DIB. *Id.* However, the SSA noted this did not constitute a final decision as to whether McClelland could continue to receive DIB in the future. *Id.* The SSA noted that its records indicated that McClelland had worked for the following employers: Tres Aguilas Enterprises, LLC (TAE); Tradesmen; Eagle Systems; McCarty; Artco-Bell Corporation (Artco); Loadcraft and A-One. *Id.* at 214.

The SSA issued a final decision regarding McClelland's disability status on November 23, 2013:

> We have decided that your disability ended because of your substantial work as of July 2011.
>
> Usually, we would stop your payments since it appears your work was substantial as of July 2011. However, based on the information we have, we will keep paying you. This is because it appears your work is not substantial after September 2011.
>
> **Information About Your Payments**
>
> Your payments continued during your period of 9 trial work months while you tested your ability to work. Your trial work period ended June 2011.
>
> **What Happens After The Trial Work Period**
>
> After the trial work period, several things happen.

4

- Your disability ends if your work activity shows your ability to do substantial work. However, we pay benefits for the month disability ends and the following 2 months no matter how much is earned. In your case, this is July 2011 through September 2011.
- You get an extended period of eligibility that begins right after the trial work period. This is a 36-month period when we restart payments for any month(s) your work is not substantial if your health problems still meet our rules. Your extended period of eligibility months are July 2011 through June 2014.

Doc. 11 at 218. The letter also reiterated that McClelland had to report any changes to his health or employment that may affect his DIB. Doc. 11 at 219.

There appears to be no contact between the SSA and McClelland from November 2013 to June 2016 and McClelland reported no additional employment to the SSA during this time. The SSA argues, however, that he worked for the following employers in that time:

Ice Card, Inc. (d/b/a/ Barracuda Group) (Ice Card): February 2014 – May 2014

Uni-Form Components Co. (Uni-Form): May 2014 – April 2015

Trinity Industries, Ltd. (Trinity): May 2015 – July 2015

Pepsico, Inc. (Pepsico); September 2015 – October 2016

On June 4, 2016, the SSA notified McClelland that it intended to revisit whether his medical impairments were still considered disabling.[2] The SSA issued a final decision on September 1, 2016, finding McClelland was no longer disabled based on his ability to work, and advised that his benefits would end in November 2016. *Id.* at 224.

McClelland reapplied for benefits on January 13, 2017. *Id.* at 227. In his application, he wrote, "I do not agree with my earnings as posted. I believe my brother has used my social security number, including for work purposes. I will make an

---

[2] The parties cite to a document not contained in the record, although it appears its existence is undisputed.

Case 5:22-cv-04062-LTS-KEM   Document 16   Filed 09/14/23   Page 5 of 16

appointment with Social Security to review my earnings record." *Id.* at 228.[3] He signed a Statement of Claimant or Other Person on January 19, 2017, in which he certified that he did not work for the following employers and requested the SSA strike the respective earnings from his records: Trinity, Uni-Form, Ice Card, TAE, Artco, Eagle Systems, Loadcraft, A-One, Tradesmen and McCarty. Doc. 11 at 234. However, McClelland no longer disputes that he worked for Eagle Systems, Loadcraft, A-One, Tradesmen, McCarty or Pepsico. *Id.* at 45-46; 148-153. He maintains that he never worked for Ice Card, Uni-Form or Trinity.[4]

On June 17, 2017, McClelland received a notice of overpayments from the SSA totaling $63,445.40. *Id.* at 41, 47 He received $35,577.10 of those overpayments at the time the SSA alleges he worked at Ice Card, Uni-Form and Trinity, and $27,868.30 while working at Pepsico (where he does not contest he worked). McClelland requested a waiver of his overpayments of DIB on September 9, 2017. *Id.* at 47. In his application, McClelland checked a box that stated "The overpayment was not my fault and I cannot afford to pay the money back and/or it is unfair for some other reasons." *Id.* at 257. McClelland also included the following note:

---

[3] McClelland completed another work history report on January 25, 2017. *Id.* at 46. This report requested he expand on the kind of work he had previously performed but it did not require he list individual employers. *Id.* at 243. He reported work in maintenance and as a welder. *Id.* The only work he reported from the relevant time period was work in maintenance at a bottling company (presumably Pepsico) from September 2015 to October 2016. *Id.*

[4] Neither party meaningfully addresses McClelland's alleged employment at TAE or Artco.

5. Why did you think you were due the overpaid money and why do you think you were not at fault in causing the overpayment or accepting the money?

*Well I didn't know I was over paid. I made several visits to your office explaining of trying to return to work each visit I was told that I will not be liable for any monies if I return to work on a Trail Be*

6. A. Did you tell us about the change or event that made you overpaid? If no, why didn't you tell us?   ☑Yes ☐No
*well as I stated above I did made aware of social security that I was trying to return work which only Required me going back in & out of the hospital I was told I would not be penalize or held at fault for trying to return to work.*

B. If yes, how, when and where did you tell us? If you told us by phone or in person, who did you talk with and what was said?
*I spoke with The Social Security office where my account was open in in the Time period of 2014.*

C. If you did not hear from us after your report, and/or your benefits did not change, did you contact us again?  ☑Yes ☐No
*each Time I called I was told I was fined and I turned in documents for hours that I worked upon Request.*

7. A. Have we ever overpaid you before?

---

**Remarks Space** – If you are continuing an answer to a question, please write the number (and letter, if any) of the question first.

*I was Totally Misunderstood about how This Trail Back To work affect My Accountablit in Regards to my SSD I Thought I was Following all The Guidelines within my SSD But I was misinformed & not in*

Form SSA-632-BK (08-2014) ef (08-2014)     Page 7     ( MORE SPACE ON NEXT PAGE )
*Over*

---

**REMARKS SPACE (Continued)**

*Total understanding on how This works I did make office Visits I was Open about Everything That I was doing So wouldn't happen I was so. Miss Informed.*

**PENALTY CLAUSE, CERTIFICATION AND PRIVACY ACT STATEMENT**

*Id.* at 258.

The SSA denied the waiver after McClelland failed to appear at a personal conference as a part of the administrative appeal process. *Id.* at 266. McClelland reported his alleged identity theft to law enforcement in December 2018. *Id.* at 137.

7

## C.	*The Adversary Proceeding*

McClelland filed for Chapter 7 bankruptcy on December 3, 2019.  Doc. 11 at 14.

Under 11 U.S.C. § 727(b), a Chapter 7 discharge generally relieves a debtor from all

debts that arose before the debtor filed the bankruptcy petition, with some exceptions.

On March 13, 2020, the United States initiated an adversary proceeding to determine

whether McClelland's overpayment debt to the SSA was dischargeable under 11 U.S.C.

§ 523(a)(2)(A).  Doc. 1.  Under that section, a debtor is not discharged from debts

obtained through "false pretenses, a false representation, or actual fraud."

For a creditor to prevail under § 523(a)(2)(A), it must demonstrate the following

by a preponderance of the evidence: (1) a debtor made a representation, (2) with

knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4)

who in turn justifiably relied on the representation which (5) proximately caused the

creditor damage.  *In re Hernandez*, 860 F.3d 591, 602 (8th Cir. 2017) (citing *Heide v.*

*Juve* (*In re Juve*), 761 F.3d 847, 851 (8th Cir. 2014)).  "Normally, exceptions to

discharge are to be narrowly construed against the creditor and liberally against the

debtor, thus effectuating the fresh start policy of the Code."  *In re Moen*, 238 B.R. 785,

791 (B.A.P. 8th Cir. 1999) (internal quotation marks omitted).

The Bankruptcy Court conducted a trial on June 8, 2022.  Doc. 1.  The SSA

argued that McClelland's overpayment debt was not dischargeable because he repeatedly

failed to disclose his work activities and therefore received the overpayments through

false pretenses.  McClelland countered that he had not intended to deceive the SSA, as

he did not work at several of the jobs reflected in SSA records, and that his identity had

been stolen.  Ultimately, the Bankruptcy Court found as follows:

> The Court finds, however, that SSA has met its burden under section
> 523(a)(2)(A) for DIB disbursed while Debtor worked at Pepsi Bottling Co.
> Thus, Debtor received $27,868.30 of overpayments while working there
> and that debt is non-dischargeable.  Because SSA has failed to sustain its
> burden of proving overpayments to other employers, it cannot establish the
> required elements of section 523(a)(2)(A) for those employers—Ice Card,
> Inc. (d/b/a Barracuda Group), Uni-Form Components Co., and Trinity

8

Industries, Ltd. The remaining balance of the alleged overpayment, $35,577.10, is dischargeable.

Doc. 1 at 13.

On appeal, there is no dispute that McClelland must repay the $27,868.30 of overpayments from his time at Pepsico. However, the parties dispute whether McClelland's debt to the SSA based on the $35,577.10 in overpayments issued while he allegedly worked at Ice Card, Uni-Form and Trinity was correctly discharged.

### III.   DISCUSSION

#### A.   Legal Standards

The bankruptcy court's findings of fact are reviewed for clear error while its conclusions of law are reviewed *de novo*. *Tri-State Financial, LLC v. First Dakota Nat'l Bank*, 538 F.3d 920, 923-24 (8th Cir. 2008). "An abuse of discretion will only be found if the district court's judgment was based on clearly erroneous factual findings or erroneous legal conclusions." *Mathenia v. Delo*, 99 F.3d 1476, 1480 (8th Cir. 1996). However, "[w]here the determinative question is purely legal, our review is more accurately characterized as *de novo*." *United States v. Ameren Missouri*, 9 F.4th 989, 1008 (8th Cir. 2021) (cleaned up). The district court may affirm, reverse or modify the bankruptcy court's ruling or remand the case for further proceedings. Fed. R. Bankr. P. 8013. "Whether a requisite element of a claim under § 523(a)(2)(A) has been satisfied is a factual determination, which we review for clear error. A finding is clearly erroneous if, after reviewing the entire evidence, we are 'left with the definite and firm conviction that a mistake has been committed.' " *R & R Ready Mix v. Freier* (*In re Freier*), 604 F.3d 583, 587 (8th Cir. 2010) (citation omitted) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

The SSA argues the Bankruptcy Court erred in four ways:

(1)   by exceeding its limited jurisdiction when it found $35,577.10 of McClelland's debt was dischargeable;

9

(2)     by requiring the SSA to prove McClelland's identity was not stolen;

(3)     by finding that McClelland's debts were dischargeable, even assuming his identity had been stolen and

(4)     by finding McClelland did not earn the wages that resulted in the $35,577.10 of overpayment.

I will address the first issue before addressing the remaining issues together.


## B.     *Did the Bankruptcy Court Exceed its Jurisdiction?*

"The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." District courts may refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district." 28 U.S.C. § 157(a). The SSA does not dispute the Bankruptcy Court's jurisdiction under either §§ 1334 or 157(a).

The Social Security Act (the Act) limits judicial review of specific administrative determinations made by the SSA. *See* 42 U.S.C. §§ 405(g), (h). Under the Act, a person may seek judicial review of final decisions by the Commissioner after exhausting the Act's outlined administrative procedures. U.S.C. § 405(g). The Commissioner's decision must be affirmed on review "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). The parties agree that McClelland did not exhaust the administrative procedures available to him to appeal the SSA's decision with regard to (1) whether he had been correctly assessed overpayments and (2) the denial of the requested waiver. For this reason, the SSA argues the Bankruptcy Court erred "by reviewing and reversing the factual bases of SSA's

overpayment assessments to determine $35,577.10 of McClelland's debt was dischargeable."

The SSA conflates two separate issues in its argument: (1) whether McClelland received overpayments he was obligated to repay under the Act's standards and (2) whether his debts to the SSA (resulting from those overpayments) are dischargeable under the bankruptcy code.[5] The Bankruptcy Court made no finding on the former, *see* Doc. 11 at 57-58 ("[T]his Court is without jurisdiction to review the factual bases for SSA's overpayment assessment.") and it was exclusively entitled to decide the latter. *In re Everly*, 346 B.R. 791, 796 (B.A.P. 8th Cir. 2006) ("[B]ankruptcy courts have exclusive jurisdiction to determine whether debts are non-dischargeable under § 523(a)(2).").

The cases the SSA cites are inapplicable. For instance, the SSA points to *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1004 (8th Cir. 1998). In that case, the hospital-plaintiffs brought suit against a Medicare fiscal intermediary alleging that the intermediary committed tortious interference with business relations by denying the hospitals' reimbursement claims. *Id.* at 1002. However, the intermediary could not be liable for tortious interference (among the other counts against it) if it had a right to deny the hospitals' claims. *Id.* at 1002.

Because "hearing [the plaintiff's] tortious interference claim would necessarily mean redeciding [the intermediary's] Medicare claims decisions," the tortious interference claim arose under the Medicare Act and was jurisdictionally barred by § 405(h). Under the third sentence of 42 U.S.C. § 405(h), "No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be

---

[5] The SSA states that "[w]hile the bankruptcy court had jurisdiction to determine whether the debt owed to SSA qualifies as a nondischargeable debt under Section 523(a)(2)(A), it lacked the jurisdiction to contravene the factual bases of SSA's overpayment assessments: specifically, that McClelland earned unreported wages in excess of SGA." Doc. 10 at 30-31. The Bankruptcy Court did not find McClelland's debt dischargeable because he was entitled to receive those payments, but instead because the SSA has not proven he obtained them fraudulently. The SSA points to no findings by the SSA that McClelland acted fraudulently.

11

brought under section 1331 or 1346 of Title 28 to recover on *any claim arising under this subchapter*."

The SSA's reliance on *Midland Psychiatric Assocs*. (and the third sentence of § 405(h)) is misplaced. McClelland did not bring an action against the United States or the Commissioner of Social Security because he does not seek to recover the DIB the SSA says he was not entitled to receive. Instead, the SSA brought an action against McClelland in an attempt to prove that his debt to the SSA is non-dischargeable in bankruptcy. Determining whether the debt is dischargeable does not require a court to redecide the SSA's overpayment assessments. At no point has the Bankruptcy Court found McClelland was entitled to the overpayments he now seeks to discharge in bankruptcy. Instead, it accepted the SSA's determinations and focused on the entirely distinct issue of whether McClelland's resulting debt to the SSA is dischargeable.

Simply put, whether McClelland exhausted his administrative remedies within the SSA is irrelevant. The SSA must not simply prove that McClelland obtained benefits he was not entitled to, but that he did so fraudulently. The cases the SSA relies upon do not address this situation. Instead, they involve plaintiffs bringing suit against the SSA to recover benefits (in various forms) available under the Act that the agency denied them through the administrative process. *See, e.g.*, *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1300 (11th Cir. 2016).[6]

Based on my de novo review, I find the Bankruptcy Court did not exceed its jurisdiction in determining whether McClelland's debts to the SSA were dischargeable.

---

[6] In *Bayou Shores*, a skilled nursing facility sought relief from a bankruptcy court to prevent the SSA from terminating a Medicare provider agreement with the facility after the facility allegedly violated the terms of its agreement with the SSA. The Eleventh Circuit found the Bankruptcy Court was without jurisdiction to review the claim because the claim (meaning, the Medicare provider agreement) arose under the Act and the plaintiff failed to exhaust its remedies.

12

## C.    *The Remaining Arguments*

The SSA's remaining arguments take issue with the Bankruptcy Court's ultimate conclusion and the findings it made to reach that conclusion.  First, the SSA argues "the bankruptcy court erred when it required the United States to prove not only each of the elements required to establish nondischargeability of a debt under Section 523(a)(2)(A), but also required the United States to affirmatively disprove McClelland's unsupported defense."  Doc. 10 at 14.  The SSA cites a portion of the Bankruptcy Court's ruling that states: "SSA has failed to prove by a preponderance of the evidence that Debtor actually worked at those places and that his identity was not stolen."  Doc. 1 at 13.  The SSA then argues that "[e]ven if fully crediting McClelland's unreasonable and unsupported identity theft accusations, McClelland's entire overpayment is nondischargeable."  Doc. 10 at 37.  The SSA also argues that the Bankruptcy Court clearly erred by crediting McClelland's argument that his identity had been stolen and that he had not made false representations with the intent to deceive the SSA.

As noted above, to establish that McClelland's debt is not dischargeable, the SSA was required to prove by a preponderance of the evidence that McClelland (1) made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, and which (5) proximately caused the creditor damage.  *In re Hernandez*, 860 F.3d at 591.  However, the Bankruptcy Court made only limited factual findings:

> Debtor claims he had no intent to deceive because he was not aware of the reporting requirements.  However, Debtor admitted to knowing the reporting requirements.  He further claims he had no intent to deceive because he never worked several of the jobs alleged.  The Court agrees. Debtor could not have had an intent to deceive based on the wages attributed to him from employers he did not work for.
>
> Debtor was not even aware that his identity had been stolen until 2015. Debtor could not have disputed or reported wages earned when he did not work at any of those places.  SSA has provided some evidence disputing Debtor's claim.  However, SSA has failed to prove by a preponderance of

> the evidence that Debtor actually worked at those places and that his identity was not stolen.

Doc. 11 at 83. The Bankruptcy Court did not set forth any findings from which it determined that McClelland's identity had been stolen, as he claimed. Nor did it make any findings with respect to the first two elements of § 523(a)(2), even though they are inextricably intertwined with the third. For instance, if the Bankruptcy Court found McClelland's identity had been stolen, then it is not clear his silence would amount to a representation or that representation could be made with knowledge of its falsity.

Whether McClelland's identity had been stolen, or whether he simply concocted that story, was hotly contested. Unfortunately, the Bankruptcy Court did not make any express findings to resolve the parties' competing sets of facts. And while "credibility determinations are virtually unreviewable on appeal," *Story v. Norwood*, 659 F.3d 680, 685 (8th Cir. 2011), the Bankruptcy Court made no such express determinations, not even as to McClelland's testimony.[7] Further, it is not clear which evidence from the SSA the Bankruptcy Court reviewed, as it did not make any findings related to any of the evidence presented by the SSA.[8]

Because the Bankruptcy Court did not elaborate on how it reached its findings, reviewing its decision for clear error would require that this court engage in fact finding—a duty relegated to the Bankruptcy Court. *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987) ("[T]he district court may not make its own independent factual findings. If the Bankruptcy Court's factual findings are silent or ambiguous as to an outcome determinative factual question, the district court may not engage in its own fact finding,

---

[7] It appears McClelland did not testify at trial, nor did he call any witnesses, but his testimony from a prior SSA hearing was admitted into evidence. Doc. 1 at 3-4.

[8] This is likely why the SSA argues the Bankruptcy Court incorrectly required the SSA to prove McClelland did not work at the three contested employers (as opposed to the elements of § 523(a)(2)) by a preponderance of the evidence.

Case 5:22-cv-04062-LTS-KEM   Document 16   Filed 09/14/23   Page 14 of 16

but instead, must remand the case to the bankruptcy court for the necessary factual determination.").

I find that remand is necessary for the Bankruptcy Court to further delineate the basis for its ruling. *In re Dolph*, 205 B.R. 832, 834 (6th. Cir. 1998) ("[W]here it is unclear how the bankruptcy court reached its conclusion such that the appellate court cannot provide an adequate review of the decision, the bankruptcy court's decision must be vacated and the case remanded for further factual determination."); *see also Federal Land Bank Of Jackson v. Cornelison* (*In re Cornelison*), 901 F.2d 1073 (11th Cir. 1990) ("The court does not discuss what evidence, if any, led it to conclude that the proposed plans met the requirements of section 1225. The bankruptcy judge appears to have provided a merely cursory rubberstamp approval of the Cornelison plans. On remand by the district court, it is imperative that the bankruptcy court clearly state factual findings which support its legal conclusions, whatever those conclusions may be.") (ordering remand); *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011) ("Instead, we conclude that a remand is necessary because the bankruptcy court's failure to make sufficient factual findings in support of its legal conclusions does not allow for meaningful appellate review under any standard."); *In re Spangler*, 56 B.R. 990, 991 (D. Md. 1986) ("If the findings of the Bankruptcy Court are made in conclusory fashion and the record below does not permit meaningful review, a remand by the district court for further proceedings may be in order."); *Tekkno Labs., Inc. v. Perales*, 933 F.2d 1093, 1097 (2d Cir. 1991) ("[W]e will normally vacate the order if the findings and the record are not sufficient to enable us to be sure of the basis of the decision below.").

Remand may not be necessary when evidence is documentary, the facts are undisputed or the record presents no issue of material fact. *In re Muncrief*, 900 F.2d 1220, 1224 (8th Cir. 1990). In this case, however, the documentary evidence can support both the SSA's and McClelland's arguments, and the facts are highly disputed. Because the basis for the decision below is unclear, I will remand this matter to the Bankruptcy Court to permit that court to elaborate on its factual findings and further explain its

conclusion that the SSA failed to establish the required elements of § 523(a)(2)(A) with regard to earnings McClelland allegedly received from the following employers: Ice Card, Inc. (d/b/a Barracuda Group), Uni-Form Components Co., and Trinity Industries, Ltd.

## IV.    *CONCLUSION*

For the reasons stated herein, the Bankruptcy Court's October 21, 2022, order (Doc. 1 at 3-14) is **reversed** and the matter is **remanded** for further development of the Bankruptcy Court's findings of fact and conclusions of law.


**IT IS SO ORDERED.**

**DATED** this 14th day of September, 2023.


_____
Leonard T. Strand, Chief Judge